UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

THOMAS D. HALEY,                    )
                                    )
            Plaintiff,              )
                                    )
     v.                             )   Case No. 4:11CV628 FRB
                                    )
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
            Defendant.              )

## MEMORANDUM AND ORDER

This matter is on appeal from an adverse ruling by the Commissioner of Social Security.  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

### I.     Procedural Background

Plaintiff Thomas D. Haley ("plaintiff") applied for Disability Insurance Benefits ("DIB") under Title II of the Act, alleging that he became unable to work due to disability on May 1, 1998.  (Administrative Transcript ("Tr.") 76-89).[1]  After his application was denied, he requested a hearing before an administrative law judge ("ALJ") which was held on January 20,

---

[1]The original certified administrative transcript filed by defendant in this matter contained information relating to a person other than plaintiff Thomas Haley.  The original certified administrative transcript was subsequently redacted by defendant, and a supplemental transcript was filed.  See (Docket Nos. 14, 21, and 22).  When citing to the administrative record, the undersigned will differentiate between the original certified administrative transcript and the supplemental transcript.

-1-

2010. (Supplemental Administrative Transcript ("S.Tr.") 714-35). On February 25, 2010, the ALJ issued a decision in which he determined that plaintiff was not disabled under the Act. (Tr. 11-19).

Plaintiff sought review from defendant agency's Appeals Council, which denied his request on November 16, 2010. (Tr. 1-3). The ALJ's decision thus stands as the Commissioner's final decision under 42 U.S.C. § 405(g). Plaintiff, proceeding pro se, brings the instant action in this Court, challenging that decision.

## II. Evidence Before The ALJ

A. Plaintiff's Testimony

During the administrative hearing, plaintiff responded to questions from his attorney.[2] Plaintiff testified that he first began feeling ill in 1998, at which time he experienced fatigue and weight gain. (S.Tr. 720). Plaintiff testified that he took prescribed medication and lost weight, but the weight began returning in 1999. (S.Tr. 720-21). Plaintiff's attorney then asked plaintiff to describe his drinking history. Plaintiff testified, "[w]ell, to put it bluntly, it's like nobody found me under a bridge some bridge some place [sic]. I mean I got up, I ate breakfast, and I went to work. I might have a couple after work and that was basically it." (S.Tr. 721). Plaintiff testified that he stopped drinking in February of 2000, but also testified

---

[2]Plaintiff was represented by counsel during the administrative proceedings, and is proceeding pro se in this Court.

that he was "not saying now and then I didn't have a beer or what not but for the most part, you know, I didn't stop at the bar after work or – – ."  (S.Tr. 721-22).

Plaintiff then responded to questions from the ALJ. Plaintiff testified that, after he initially took prescribed diuretic medication and lost weight, he felt good for a month or two.  (S.Tr. 724).  The ALJ and plaintiff then had a lengthy exchange regarding plaintiff's alleged onset date.  The ALJ asked plaintiff what symptoms he was having at the time of his alleged onset date, May 1, 1998, that led him to believe he could not work, and plaintiff replied, "fatigue, tired, somewhat despondent, then the weight gain." (S.Tr. 727).  Plaintiff testified that he saw a doctor who diagnosed him with ascites,[3] and was then referred to another doctor who performed blood work.  (Id.)  Plaintiff testified that, at that time, he was paying for his care with his own money, and he "felt good so I didn't think that much more about it."  (Id.)  Plaintiff testified that he worked "a little bit but then the whole thing started all over again" a couple of months later.  (S.Tr. 728).

Plaintiff testified that he filed an application for Social Security Income in July or August of 2001.  (S.Tr. 728-29). Plaintiff testified that, between May 1, 1998 and June 30, 2000, he

---

[3]The term "acites" refers to the accumulation of serous fluid in the peritoneal cavity. STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000), available at STEDMAN'S 34140 (Westlaw).

would have been unable to do any full-time work because, due to the nature of his disease, he could not perform sustained work activity, he would have missed more than two days of work each month, and would have been unable to hold a job. (S.Tr. 730-31). Plaintiff testified that his condition was developing faster, and that he was depressed because he could not do anything about it. (Id.) He stated that he had read and educated himself about his condition. (S.Tr. 733).

B.   Medical Records[4]

1.   Medical Evidence Generated Before The Expiration Of Plaintiff's Insured Status

Records from Richard F. Jotte, M.D., indicate that plaintiff was told, in April of 1997, that his liver enzymes were abnormal and that he "must stop alcohol." (Tr. 157).

Records from Arthur Gale, M.D., show that plaintiff presented for treatment on May 1, 1998 with complaints of abdominal distention. (Tr. 146-47). Dr. Gale noted that plaintiff had alcohol on his breath, and noted that he discussed with plaintiff the severity of his alcohol abuse. (Id.) CT scan performed on May 5, 1998 revealed moderate ascites and probable cirrhosis, and plaintiff was referred to David Jick, M.D., a Gastroenterologist. (Tr. 147).

---

[4]The following summary includes medical evidence dated after June 30, 2000, plaintiff's last date insured, and also includes medical evidence submitted by plaintiff.

Plaintiff saw Dr. Jick on May 15, 1998, and reported that he drank ½ pint to one pint of alcohol per day.  (Tr. 167).  Dr. Jick noted the presence of alcohol on plaintiff's breath.  (Tr. 168).  Plaintiff reported that he had experienced abdominal distention a few weeks ago but that now he felt "great" and had no complaints.  (Tr. 167).  Dr. Jick noted that the ascites had clinically resolved.  (Tr. 168).

Plaintiff returned to Dr. Jotte in early March, 1999 with complaints of sore throat and cough with dark sputum.  (Tr. 159).  Plaintiff returned on March 4, 1999 and reported he was not better, and Dr. Jotte prescribed an antibiotic.  (Tr. 156).  Plaintiff returned to Dr. Jotte on December 21, 1999 with complaints of a dry cough, sore throat, and head congestion.  (Id.)  Dr. Jotte noted that plaintiff smelled of alcohol.  (Id.)  Dr. Jotte diagnosed acute bronchitis and prescribed medication.  (Id.)

Dr. Jotte's records include a notation dated January 3, 2000, at which time plaintiff was apparently given medication to control a productive cough.  (Tr. 156).

On June 8, 2000, plaintiff saw Dr. Jotte and reported that he had been gaining weight and retaining fluid, and that his abdomen and ankles had been swelling.  (Tr. 156).  Plaintiff reported that he was a smoker.  (Id.)  He reported that he had reduced his alcohol intake to around four beers per day, and that he "[h]ad been up to 'too many to count'".  (Id.)  He was not taking diuretics.  (Id.)  Dr. Jotte diagnosed plaintiff with cirrhosis.  (Tr. 156).  Dr. Jotte's records indicate that he

-5-

prescribed Furosemide[5] and Spironolactone.[6]   (Tr. 154-62).

2.   <u>Medical Evidence Generated After The Expiration Of Plaintiff's Insured Status</u>

On November 15, 2000, plaintiff returned to Dr. Jotte with complaints of increasing ankle edema over the past month. (Tr. 155).  Plaintiff stated that he had been "off diuretics for quite some time." (<u>Id.</u>) (Tr. 155).  Plaintiff stated he had cut back to drinking about four drinks per day, and that some days he did not drink at all. (<u>Id.</u>)  Plaintiff stated that he had consumed three beers before the office visit. (<u>Id.</u>)  Upon examination, plaintiff's abdomen was distended and he had lower extremity edema. (Tr. 155).  Dr. Jotte diagnosed plaintiff with alcoholic liver disease, prescribed Lasix (Furosemide) and Aldactone (Spironolactone), and referred plaintiff to Raymond F. Mohrman, M.D. (<u>Id.</u>)

Plaintiff saw Dr. Mohrman on November 29, 2000, and Dr. Mohrman noted that "over the past couple of months, [plaintiff] has had a marked increase in his weight, abdominal girth, and marked peripheral edema." (Tr. 163).[7]  Dr. Mohrman noted that the most

_____

[5],[4] Furosemide and Spironolactone are diuretics.  They are used to reduce the swelling and fluid retention caused by various medical problems, including heart or liver disease. They are also used to treat high blood pressure.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html;
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601111.html.


[7]This record is Dr. Mohrman's January 1, 2001 letter to Dr. Jotte, in which Dr. Mohrman describes to Dr. Jotte the treatment he provided to plaintiff in November and December of 2000. (Tr. 163-64).

likely cause of plaintiff's liver disease is "chronic alcohol consumption which has been present for greater than 20 years." (Id.) Dr. Mohrman noted that plaintiff had discontinued taking Furosemide and Spironolactone "for inapparent reasons." (Id.) Upon examination on November 29, 2000, plaintiff weighed 250 pounds; had "marked spider angiomata" (an abnormal collection of blood vessels under the skin), jaundice, yellowing of the sclera of the eyes, 4+ pitting edema, and 4+ ascites. (Id.)

On December 5, 2000, Dr. Mohrman performed paracentesis.[8] (Tr. 163, 560-62). In his report of this date,[9] Dr. Mohrman noted that plaintiff had been told to stop drinking but did not do so, and that it was most likely that his liver disease was caused by alcohol consumption. (Tr. 560). Dr. Mohrman noted that Dr. Jotte had prescribed Furosemide and Spironolactone, but that plaintiff took the medication for only a couple of days before stopping. (Id.) Physical examination before the paracentesis procedure was performed yielded findings similar to those noted on November 29, 2000. (Id.) Dr. Mohrman noted that paracentesis was necessary to manage plaintiff's fluid overload and to rule out possible causes, but that it was "most likely all ascites secondary to liver

---

[8]Also called "abdominal tap," paracentesis is a procedure during which a tap needle is inserted into the abdomen via which fluid is removed from the abdominal cavity. http://www.nlm.nih.gov/medlineplus/ency/article/003896.htm;

[9]More than one copy of this report appears in the administrative transcript, and plaintiff also submitted an annotated copy with his brief. For purposes of simplicity, in this summary of the medical information of record, the undersigned will cite only to the copy of the report which appears in the administrative transcript at pages 560-62.

failure." (Tr. 561).

Following the paracentesis, Dr. Mohrman noted that a total of six liters of fluid were removed. (Id.) He diagnosed plaintiff with advanced cirrhosis questionably secondary to chronic alcoholism, which was manifesting itself as jaundice and marked fluid overload. (Id.) Dr. Mohrman re-started plaintiff on Furosemide and Spironolactone, and wrote that he had had a very long discussion with plaintiff regarding his diagnosis, the cause of his liver disease, and his prognosis. (Id.) Dr. Mohrman wrote that plaintiff "seem[ed] to have very little insight into his liver disease, its severity and the fact that he is a chronic alcoholic." (Tr. 561). Dr. Mohrman wrote that he suspected that plaintiff would have difficulty abstaining from alcohol, and that, while he had offered plaintiff inpatient or outpatient alcohol rehabilitation, plaintiff did not feel he needed it. (Tr. 561-62). Dr. Mohrman wrote that plaintiff's overall prognosis was "very grim." (Tr. 562).

On December 20, 2000, plaintiff returned to Dr. Mohrman and reported progressive improvement and steady weight loss since undergoing paracentesis. (Tr. 164). Upon examination, Dr. Mohrman noted that plaintiff's ascites were markedly decreased, and he had only trace to 1+ pitting edema in his lower extremities. (Id.) Plaintiff reported that he had "not been entirely compliant with avoiding alcohol." (Id.) Dr. Mohrman opined that plaintiff had very advanced cirrhotic liver disease, most likely secondary to alcohol, and that plaintiff's major complicating factor was ascites

and fluid overload, which was being managed with diuretics and paracentesis. (Id.)

On June 30, 2001, plaintiff was admitted to Barnes-Jewish Hospital with complaints of weakness and decreased appetite over the past week. (Tr. 284). He was taking Furosemide and Spironolactone. (Id.) He complained of a gradual increase in abdominal girth, and was noted to have a large protrudent abdomen with a large umbilical hernia. (Id.) Plaintiff was admitted to the hospital, where his fluids were restricted and he was started on a saline drip. (Tr. 285). Plaintiff did not improve, and underwent paracentesis which yielded five liters of fluid which was tested and revealed no likely infectious etiology for plaintiff's symptoms. (Tr. 285, 443-44). After "a couple of days of [plaintiff's] non-compliance with fluid restrictions," his sodium level began to rise. (Id.) On July 6, 2001, plaintiff underwent a "TIPS" procedure,[10] and was discharged on July 8, 2001. (Tr. 285). At the time of discharge, it was noted that, while the results of laboratory testing were not satisfactory, "it was felt due to [plaintiff's] liver failure that these were relatively steady state conditions which would not improve with further

---

[10]TIPS, which stands for Transjugular Intrahepatic Portosystemic Shunt, is a procedure via which a shunt is inserted to create new connections between blood vessels in the liver and allow blood to flow more freely.  It is performed via a catheter inserted into the jugular vein.  This procedure is performed to treat portal hypertension, or increased pressure in and backup of the portal vein.  The portal vein is the vein that carries blood from the digestive organs to the liver.
http://www.nlm.nih.gov/medlineplus/ency/article/007210.htm

hospitalization." (Id.)

On July 16, 2001, plaintiff presented to the emergency room at Barnes Jewish Hospital with complaints related to an umbilical hernia. (Tr. 208). He was noted to be taking Lasix (Furosemide) and Spironolactone. (Id.) He underwent umbilical hernia repair. (Tr. 213-25). Subsequently, plaintiff suffered complications from stitch abscesses, which were treated surgically. (Tr. 469-70, 473, 509).

Records from Barnes-Jewish Hospital indicate that abdominal and hepatic sonography performed on August 21, 2002 revealed cirrhotic changes and minimal ascites. (Tr. 466-67). Abdominal sonography performed on October 23, 2002 revealed narrowing at the junction of the previously-placed shunt, with interval development of mild ascites. (Tr. 465-66). On October 29, 2002, plaintiff underwent TIPS revision. (Tr. 457-64).

On March 7, 2003, plaintiff presented to DePaul Health Center via ambulance after his mother noticed that he had decreasing mental status and was difficult to rouse. (Tr. 568). Plaintiff was noted to be confused, and his history of "end-stage liver disease for cirrhosis" and treatment was noted, and it was also noted that plaintiff had been prescribed Lactulose[11] but that he did not take it. (Tr. 568, 575). He reported no recent heavy

---

[11]Lactulose is a synthetic sugar that is used to treat constipation and also to treat excess amounts of ammonia in the blood of people with liver disease. It works by drawing ammonia from the blood into the colon where it can be removed from the body. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682338.html

alcohol use or drug use, and stated that his mental symptoms began that day.  (Tr. 575).  It was noted that plaintiff had recently been diagnosed with diabetes, and was taking insulin and Starlix.[12] (Tr. 568).  Examination revealed some yellowing of the sclerae, but no edema of the extremities and no marked distention or ascites. (Tr. 568-69).  Laboratory testing revealed an elevated ammonia level.  (Tr. 573).  Brain CT revealed some increased density in the left parietal convexity adjacent to the midline, and an MRI of the brain was recommended.  (Tr. 607).  It was noted that plaintiff was experiencing difficulty controlling his blood sugar.  (Tr. 573-74). Plaintiff was given Lactulose in large doses to decrease his ammonia level.  (Tr. 574).

Sonography performed on August 26, 2004 revealed stent stenosis (narrowing), and plaintiff underwent TIPS revision on September 2, 2004.  (Tr. 525, 523).

On May 8, 2005, plaintiff presented to the emergency room at DePaul Health Center with complaints of a scalp laceration that occurred when he was trimming a tree.  (Tr. 613).  Plaintiff explained that a tree branch fell and struck his head.  (Id.) Plaintiff was alert and in no distress, his abdomen was soft and non-tender, and examination of his extremities was normal.  (Tr. 614).  Plaintiff received wound care, and was discharged in stable condition.  (Id.)

Visceral sonography performed on July 21, 2005 at Barnes-

---

[12]Starlix, or Nateglinide, is used to treat diabetes. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699057.html

Jewish Hospital revealed a functioning TIPS.  (Tr. 677).  Visceral sonography performed at Barnes-Jewish Hospital on August 7, 2006 revealed some narrowing of the proximal stent, and follow-up was recommended.   (Tr.  676).  Visceral  and  abdominal  sonography performed at Barnes-Jewish Hospital on February 20, 2008 due to elevated liver enzymes revealed a functioning TIPS, and cirrhosis. (Tr. 662-63).

On March 17, 2008, plaintiff was seen by Ingrid D. Taylor, M.D., of the Washington University School of Medicine Hepatology Program.  (Tr. 695).  Plaintiff stated that he had been doing fairly well and that his chronic fatigue had improved.  (Id.) Physical  examination,  including  examination  of  plaintiff's extremities and abdomen, was within normal limits.  (Id.)  Dr. Taylor opined that plaintiff's liver disease seemed "to be fairly well controlled."  (Tr. 696).

Bone  density  screening  performed  at  Barnes-Jewish Hospital on March 19, 2008 revealed normal density in the lumbar spine and hip, and mildly decreased density in the left femoral neck.  (Tr. 659-60).

On March 16, 2009, plaintiff saw Jeffrey S. Crippin, M.D., of the Washington University School of Medicine Department of Internal Medicine, Division of Gastroenterology for consultation due to alcoholic hepatitis with TIPS.  (Tr. 701).  Dr. Crippin noted that plaintiff was overall in good health, with the exception of an angioma over his left eye which was evaluated by the dermatology department and found to be benign.  (Id.)

-12-

On June 8, 2009, Medical Consultant Kevin Threlkheld completed a Physical Residual Functional Capacity Assessment form. (Tr. 621-27). Mr. Threlkheld opined that plaintiff could occasionally lift 20 pounds and frequently lift ten; could stand, walk, and/or sit for about six hours in an eight-hour workday; and could push and/or pull without limitation. (Id.) Mr. Threlkheld opined that plaintiff could perform all postural maneuvers on an occasional basis, and had no manipulative, visual, or communicative limitations. (Tr. 623-24). Mr. Threlkheld opined that plaintiff should avoid concentrated exposure to extreme temperatures, hazards, and fumes, odors, dusts, gases, and poor ventilation. (Tr. 625).

On August 6, 2009, plaintiff returned to Dr. Taylor and reported a marked decrease in his overall energy level, and stated that he was unable to work and was requesting disability benefits. (Tr. 628). He had no change in his fluid retention, and denied mental status changes. (Id.) Dr. Taylor noted that, while alcoholic liver disease could lead to a marked decrease in energy level, testing showed that plaintiff's hepatic synthetic function remained normal, and that his portal hypertension remained well controlled by the TIPS. (Id.) Dr. Taylor opined that plaintiff's fatigue was "multifactorial" and could have other contributing factors such as diabetes. (Id.) Dr. Taylor opined that "[c]learly his symptoms limit his ability to work." (Id.)

Also on August 6, 2009, plaintiff saw Dr. Crippin. (Tr. 629-31). Dr. Crippin noted plaintiff's chief complaint as "I am in

-13-

disability." (Tr. 630). Plaintiff's history of liver disease and
his TIPS placement in 2001 and revision in 2002 were noted. (Id.)
Plaintiff complained of fatigue and essential tremor. (Id.) He
stated that he had a history of alcohol abuse, but had been
abstinent since 2000. (Id.) Examination revealed spider angiomas
and slight tremor, but no edema or abdominal distention. (Tr.
630). On August 19, 2009, visceral sonography revealed coarsened
texture of the liver, and a functioning TIPS. (Tr. 706).

### 3. Evidence Submitted By Plaintiff

The following medical information was submitted by
plaintiff with his brief in support of his Complaint.

On March 15, 2010, Dr. Crippin wrote that plaintiff was
under his care for alcoholic cirrhosis, that a shunt had been
placed in his liver years ago, and that the fluid in plaintiff's
abdomen had subsequently been well controlled. (Docket No. 18,
Attachment 2, page 3). Dr. Crippin wrote that "[r]ecently,
[plaintiff] has had profound fatigue that will markedly limit his
ability to maintain the obligations of any occupation. Thus, I ask
that he be considered for disability." (Id.)

On April 5, 2010, Dr. Mohrman wrote that he had not seen
plaintiff since June 19, 2001 but that, based upon his old
evaluation, plaintiff had severe and advanced alcoholic cirrhosis
and was then "markedly disabled" due to refractory ascites which
were uncontrolled. (Docket No. 18 at page 16). Dr. Mohrman wrote
that plaintiff told him he had undergone shunt placement with
subsequent revision, and that he was compliant with diuretics in

-14-

2000 and 2001.  (Id.)  Dr. Mohrman wrote that plaintiff had been
drinking sporadically, but reported that he stopped completely in
2000 and had been compliant ever since.  (Id.)  Dr. Mohrman wrote
that plaintiff's condition, prognosis, and degree of disability
would be best assessed by a physician who had been caring for him
during recent years.  (Id.)

On June 21, 2010, Zhiyu Wang, M.D., of the Washington
University School of Medicine Department of Internal Medicine,
Divisions of Endocrine, Metabolism, and Lipid, wrote that plaintiff
was under his care for type 2 diabetes, and had been using
intensive insulin therapy for diabetes control.  (Docket No. 18,
Attachment 2, page 1).  Dr. Wang wrote that plaintiff's "unstable
blood glucose may limit his ability to maintain the obligations of
occupation.  Thus, I recommend him be considered for disability."
(Id. at page 1).

On July 22, 2010, Joanne L. Thanavaro, DNP, APRN-BC,
wrote that plaintiff was under Dr. Crippin's care for long-standing
alcoholic cirrhosis, and under Dr. Wang's care for diabetes.  (Id.
at page 2).  Ms. Thanavaro stated that she agreed with Drs. Crippin
and Wang that plaintiff should be considered for disability.  (Id.)

Plaintiff also submitted records from DePaul Hospital and
Sriram Vissa, M.D., documenting a hospital admission on August 20,
2010.  (Docket No. 18, Attachment 1, pages 1-6).  Plaintiff was
brought to the hospital by family members who noted that he had an
unsteady gait, slurred speech, difficulty with motor skills,
difficulty smoking, and difficulty eating.  (Id. at pages 2-3).  It

was noted that plaintiff's diabetes was uncontrolled, and that he had hepatic encephalopathy (a worsening of brain function due to the liver's inability to remove toxins from the blood) and a left occipital arteriovenous malformation (also "AVM," a tangle of arteries and veins). (<u>Id.</u>) Plaintiff underwent embolization of the AVM. (<u>Id.</u> at pages 2-3).

On October 21, 2010, Nirav Vora, M.D., Assistant Professor of Neurology at Saint Louis University, noted plaintiff's evaluation at DePaul Hospital for an unruptured arteriovenous malformation, and noted that he had had undergone successful embolization. (<u>Id.</u> at page 8). Dr. Vora wrote that the lesion represented advanced hepatic disease, as these lesions were seen in severe cirrhosis, and that plaintiff's advanced liver disease rendered him incapable of regular work. (<u>Id.</u>) Dr. Vora wrote that plaintiff "would be a candidate for disability assistance." (<u>Id.</u>)

On March 21, 2011, Dr. Crippin wrote that plaintiff had been under his care for alcoholic liver disease for approximately ten years, and that TIPS placement had lead to reasonable control of his fluid retention. (Docket No. 18, Attachment 1, page 7). Dr. Crippin wrote that plaintiff had had intermittent episodes of hepatic encephalopathy that required hospitalization, and profound fatigue that made it impossible for him to perform the obligations of his profession. (<u>Id.</u>)

On June 9, 2011, Dr. Jotte wrote that plaintiff had been seen in the office on June 6, 2011, and that this was the first visit since December 15, 2000. (Docket No. 18 at page 11). Dr.

Jotte wrote that plaintiff reported that he had not been consuming alcohol during the years 1998-2000.  (Id.)

Plaintiff also submitted records from Drs. Jotte and Gale dated in February and May of 1998, and Dr. Mohrman's December 5, 2000 report.  These materials were included in the original administrative transcript, and are summarized above.  Plaintiff also submitted nine pages of pharmacy records dated December 4, 2000 through September 12, 2003.  (Docket No. 18, Attachment 3).  Plaintiff also submitted four pages of AA meeting attendance slips documenting plaintiff's attendance at AA meetings in 2002 through 2004.  (Docket No. 18, Attachment 4).

### III.    The ALJ's Decision

The ALJ determined that plaintiff last met the insured status requirements of the Social Security Act on June 30, 2000.  (Tr. 16).  The ALJ determined that plaintiff did not engage in substantial gainful activity during the period beginning on his alleged onset date through his last date insured.  (Id.)

The ALJ determined that plaintiff had the severe impairments of cirrhosis of the liver, and alcoholism.  (Id.)  The ALJ analyzed the evidence of record and concluded that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  (Tr. 17).

The ALJ determined that plaintiff retained the residual functional capacity (also "RFC") to perform the full range of light work, and also determined that plaintiff was unable to perform his past relevant work.  (Tr. 17-18).  Using the Medical-Vocational

-17-

Guidelines, the ALJ concluded that plaintiff was not under a disability, as such is defined by the Act, at any time from plaintiff's alleged onset date through June 30, 2000, his last date insured.

### IV.    Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act (also "Act"), plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).   The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant

is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then he is not disabled.  The Commissioner then determines whether the claimant's impairment(s) meet or equal any listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to a listed impairment, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

To be eligible for disability benefits under Title II, a claimant must demonstrate that his condition was disabling prior to the expiration of his insured status.  20 C.F.R. § 404.130; see also Davidson v. Astrue, 501 F.3d 987, 989 (8th Cir. 2007), Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).  Therefore, as the Commissioner states, and as plaintiff does not contest, the relevant time period in this case is plaintiff's alleged onset date, May 1, 1998, through his last date insured, June 20, 2000.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42

-19-

U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  Id. (internal quotation marks and citations omitted).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).

       "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."  Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003); see also Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (In the event that two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole).

       In the case at bar, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as

a whole.  In support, plaintiff alleges that the ALJ improperly considered that plaintiff failed to take his medications and failed to stop drinking in assessing his credibility.  Plaintiff also argues that the ALJ improperly focused upon the diagnosis of ascites when in fact cirrhosis was the main issue, and states that he could never work for longer than three and ½ hours.  Plaintiff takes issue with several statements in Dr. Mohrman's December 5, 2000 report, and also argues that the letters and the new evidence he submitted support his application for benefits.  In response, the Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole.

    A.   <u>Credibility Determination</u>

The ALJ in this case determined that plaintiff's medically determinable impairments could be expected to cause some of the alleged symptoms, but that his statements concerning the intensity, persistence and limiting effects were not entirely credible.  Plaintiff challenges this determination, arguing that it was error for the ALJ to consider that he continued to drink alcohol despite medical advice to stop and that he was not compliant with medication.  Review of the record reveals no error.

Before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of his subjective complaints.  <u>Wagner v. Astrue</u>, 499 F.3d 842, 851 (8th Cir. 2007) (citing <u>Pearsall</u>, 274 F.3d at 1217).  Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of his alleged physical impairment.

-21-

Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski at 1321-22. In Polaski, the Eighth Circuit addressed this difficulty and established the following standard for the evaluation of subjective complaints:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

> Id. at 1322.

Although the ALJ is not free to accept or reject the claimant's subjective complaints based upon personal observations alone, he may discount such complaints if there are inconsistencies in the evidence as a whole. Id. The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). When an ALJ explicitly considers the Polaski factors and discredits a claimant's complaints for a good reason, that decision should be upheld.

-22-

Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).  The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject.  Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In assessing plaintiff's credibility, the ALJ in this case wrote that he had considered plaintiff's subjective allegations in accordance with 20 C.F.R. §§ 404.1529 and Social Security Rulings 96-4p and 96-7p, which correspond with the Polaski decision and credibility determination.  The ALJ then analyzed the evidence of record and explicitly noted inconsistencies in the record detracting from plaintiff's credibility.

The ALJ noted that plaintiff's credibility was diminished by evidence in the record demonstrating that he continued to drink alcohol despite the impact on his liver disease and despite being told by his doctors to stop completely.  This finding is supported by the record.  According to the medical evidence of record, plaintiff continued to consume alcohol even though he had been told to abstain as early as April of 1997.  On May 15, 1998, plaintiff reported drinking ½ to one pint of alcohol per day.  During a March 1999 office visit, Dr. Jotte noted that plaintiff smelled of alcohol.  On June 8, 2000, plaintiff told Dr. Jotte that he consumed four beers per day.  In addition, while plaintiff testified that he stopped drinking in February of 2000, he qualified that testimony with the statement "I mean I'm not saying now and then I didn't have a beer or what not . . .".  (S.Tr. 721-

-23-

22).   An ALJ may properly consider a claimant's refusal to comply with medical advice as a factor detracting from his credibility. See Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008) (citing Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005)).

In addition, the undersigned notes that plaintiff's hearing testimony differed from plaintiff's reports to his physicians regarding his alcohol consumption.   While plaintiff testified that he stopped drinking in February of 2000 but may have had "a beer or what not" (S.Tr. 722), the medical evidence documents that he repeatedly reported drinking four beers per day. See Thompson v. Astrue, 226 Fed.Appx. 617, 619-620 (8th Cir. 2007) (discrepancies between a claimant's hearing testimony and his reports to his physicians was one factor supporting the ALJ's adverse credibility determination).

The ALJ also considered the observations of plaintiff's treatment providers that plaintiff had a history of non-compliance with medication.   Although plaintiff alleges error, the medical evidence of record supports the ALJ's consideration of medication non-compliance as part of his credibility determination.   Plaintiff does not allege that, during the relevant time period, diuretics caused intolerable side effects or that he could not afford them. While plaintiff states that he had a good reason to stop taking diuretics, this is not supported by the record.   Dr. Jotte prescribed Furosemide and Spironolactone to control plaintiff's symptoms of weight gain, fluid retention, and edema on June 8, 2000.   However, in November of 2000, both Drs. Jotte and Mohrman

-24-

noted that plaintiff repeatedly stopped taking the medication.
While those observations were included in records dated after the
expiration of plaintiff's insured status, the medication plaintiff
was refusing to take was prescribed before the expiration of his
insured status, and Dr. Jotte noted that plaintiff had been off the
medication for "quite some time." (Tr. 155).  Considering this
along with plaintiff's subsequent history of medication non-
compliance, the ALJ acted within his statutory authority in
considering evidence of plaintiff's documented history of non-
compliance with medication as one factor detracting from the
credibility of his subjective allegations of symptoms precluding
all work.   See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir.
2001) (an ALJ may consider non-compliance with medical treatment in
discrediting subjective complaints).

        The ALJ's adverse credibility determination is also
supported by the fact that the record contains no evidence
documenting that plaintiff sought consistent, ongoing medical
treatment for the symptoms he now alleges rendered him totally
disabled.   In his reply brief, plaintiff contends that the
Commissioner's statement that plaintiff did not seek treatment
until June of 2000 is "wrong."  (Docket No. 26 at page 1).
However, while plaintiff may have sought medical treatment between
May of 1998 and June of 2000, that treatment was for complaints of
upper respiratory symptoms and bronchitis, not ascites or edema or
other manifestations of his liver condition.  The medical evidence
documents that plaintiff sought treatment for ascites and edema in

May of 1998, and that his symptoms resolved.  Plaintiff did not
seek treatment for those symptoms again until June 8, 2000, at
which time he complained of weight gain and fluid retention and was
prescribed diuretics, and did not seek treatment again until
November 15, 2000.  At that time, it was noted that his symptoms
had returned over the past month (which would be October of 2000,
after the expiration of his insured status) and that he had stopped
taking his medication.  Plaintiff's lack of regular and sustained
treatment during the relevant time period for the symptoms he
alleges rendered him totally disabled is a basis for discounting
his complaints, and is an indication that his impairments were non-
severe and not significantly limiting for twelve continuous months.
Novotny v. Chater, 72 F.3d 669, 671 (8th Cir. 1995).

        Also notable is the fact that, when plaintiff did seek
treatment during the relevant time period for the symptoms he now
alleges rendered him totally disabled, he did not describe to his
doctors the severe functional limitations he described during the
administrative hearing, nor did any of his doctors advise him to
limit his activities as severely as he alleges he needed to.
Finally, while receiving medical treatment between May 1998 and
June 2000, plaintiff did not complain about the symptoms he now
alleges rendered him totally disabled.  See Stephens v. Shalala, 46
F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting later
allegations of back pain when no complaints made about such pain
while receiving other treatment).

        Review of the ALJ's credibility determination shows that,

in a manner consistent with and required by <u>Polaski</u>, he considered
plaintiff's subjective complaints on the basis of the record before
him, and gave good reasons for finding plaintiff's allegations not
fully credible.  An ALJ may disbelieve subjective complaints where
there are inconsistencies on the record as a whole.  <u>Battles v.</u>
<u>Sullivan</u>, 902 F.2d 657, 660 (8th Cir. 1990).  Because the ALJ
discredited plaintiff's subjective complaints for a good reason,
that decision should be upheld.   <u>Hogan</u>, 239 F.3d at 962.

    B.   <u>RFC Determination</u>

      The ALJ in this case determined that, during the relevant
time period, plaintiff retained the RFC to perform the full range
of light work.  Plaintiff argues that the ALJ improperly focused
upon ascites when in fact cirrhosis was the main issue.  Plaintiff
also argues that he was unable to do more than three and ½ hours of
work, and that his condition would have caused him to miss too much
work.  Review of the ALJ's decision reveals no error.

      Residual functional capacity is defined as that which a
person remains able to do despite his limitations.  20 C.F.R. §§
404.1545(a), 416.945(a); <u>Lauer v. Apfel</u>, 245 F.3d 700, 703 (8th
Cir. 2001).  The ALJ must assess a claimant's RFC based upon all
relevant, credible evidence in the record, including medical
records, the observations of treating physicians and others, and
the claimant's own description of his symptoms and limitations.  20
C.F.R. §§ 404.1545(a), 416.945(a); <u>Anderson v. Shalala</u>, 51 F.3d
777, 779 (8th Cir. 1995); <u>Goff v. Barnhart</u>, 421 F.3d 785, 793 (8th

Cir. 2005).

A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination.  Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance, Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863, nor is the ALJ required to mechanically list and reject every possible limitation.  McCoy v. Astrue, 648 F.3d 605, 615 (8th Cir. 2011). The claimant bears the burden of establishing his RFC.  Goff, 421 F.3d at 790.

In this case, after considering all of the evidence of record probative of plaintiff's condition before the expiration of his insured status, the ALJ determined that plaintiff's impairments during the relevant time period would not prevent him from performing the full range of light work activity.  Despite plaintiff's contention that could not work for longer than three and ½ hours, the ALJ's conclusion is supported by the record which documents that plaintiff sought treatment for ascites and edema in May of 1998, that his symptoms resolved, and that he did not seek treatment for those symptoms again until June 8, 2000, at which time he was prescribed diuretics.  Plaintiff did not seek treatment again until November 15, 2000, at which time he stated that his

-28-

symptoms had returned over the last month, which would mean October
of 2000, after the expiration of his insured status.   During the
relevant time period, plaintiff reported feeling great and did not
describe any functional limitations to his doctors at all, much
less functional limitations of the severe nature he describes here.
Plaintiff's treatment records fail to demonstrate that plaintiff's
symptoms were intractable or uncontrollable or caused significant
functional limitations before the expiration of his insured status.
Conditions which are controllable or amenable to treatment cannot
be considered disabling.   Kisling v. Chater, 105 F.3d 1255, 1257
(8th Cir. 1997).

        Plaintiff contends that the ALJ improperly focused upon
ascites when cirrhosis was the main problem.   While plaintiff
correctly asserts that he was diagnosed with cirrhosis during the
relevant time period, it was proper for the ALJ to focus upon
ascites because ascites was the symptom that was documented in the
medical evidence pertaining to the relevant time period.   As the
Commissioner correctly notes, the mere presence of an impairment
does not demand a finding of disability.   There must be a
demonstration of functional loss that establishes the inability to
engage in substantial gainful activity.   See Trenary v. Bowen, 898
F.2d 1361, 1364 (8th Cir. 1990) (the mere presence of a mental
disturbance is not disabling per se, absent a showing of severe
functional loss establishing an inability to engage in substantial
gainful activity).

        Plaintiff also appears to assert that the ALJ should have

-29-

assessed limitations resulting from an umbilical hernia.  However, the relevant medical evidence fails to demonstrate that plaintiff complained of pain or any other symptoms attributable to an umbilical hernia during the relevant time period.  Without evidence of severe functional loss establishing the inability to engage in substantial gainful activity, plaintiff's umbilical hernia was not disabling.  See Trenary, 898 F.2d at 1364; see also Higgs v. Bowen, 880 F.2d 860 (8th Cir. 1988) (A mere diagnosis says nothing about the severity of a condition).  The evidence simply fails to support the conclusion that plaintiff had the necessary functional loss to support the finding that he was totally disabled and unable to perform any work before the expiration of his insured status.  Instead, the medical evidence pertaining to the relevant time period documents that plaintiff's symptoms were transient and controllable.  To be eligible for disability benefits under Title II, a claimant must demonstrate that his condition was disabling prior to the expiration of his insured status.  20 C.F.R. § 404.130; see also Davidson, 501 F.3d at 989, Cox, 471 F.3d at 907.

As discussed above, the ALJ in this case conducted a legally sufficient credibility analysis, and rejected as inconsistent with the record as a whole plaintiff's subjective allegations of symptoms precluding all work.  See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record.").  The ALJ also limited plaintiff to light work, which

represents  significant  functional  limitations.   See  Choate  v.
Barnhart,  457  F.3d  865,  870  (8th  Cir.  2006)  (citing  Ellis  v.
Barnhart, 392 F.3d 988, 994 (8th Cir. 2005)).

Plaintiff  contends  that  the  additional  evidence  he
submitted  with  his  brief,  summarized  above  in  Section  II(B)(3),
supports  his  application  and  forms  a  basis  for  remand.    Section
405(g)  generally  precludes  the  consideration  of  evidence  that  was
not  part  of  the  administrative  record  before  the  Commissioner
during the administrative proceedings.  Jones v. Callahan, 122 F.3d
1148,  1154  (8th  Cir.  1997)  (citing  Delrosa  v.  Sullivan,  922  F.2d
480,  483  (8th  Cir.  1991)).    Remand  is  appropriate  only  when  the
claimant demonstrates "that there is new evidence which is material
and  that  there  is  good  cause  for  the  failure  to  incorporate  such
evidence  into  the  record  in  a  prior  proceeding."   Jones,  122  F.3d
at  1154  (citing  42  U.S.C.  §  405(g),  Thomas  v.  Sullivan,  928  F.2d
255, 260 (8th Cir. 1991)).

Evidence  is  considered  to  be  material  when  it  relates  to
the  claimant's  condition  for  the  time  period  for  which  benefits
were  denied,  and  not  to  "after-acquired  conditions  or  post-decision
deterioration of a pre-existing condition."  Bergmann v. Apfel, 207
F.3d  1065,  1069-70  (8th  Cir.  2000);  see  also  Jones,  122  F.3d  at
1154  (citing  Woolf  v.  Shalala,  3  F.3d  1210,  1215  (8th  Cir.  1993)
(to  be  considered  material,  the  new  evidence  must  be  "non-
cumulative, relevant, and probative of the claimant's condition for
the  time  period  for  which  benefits  were  denied.").    It  must  also  be
reasonably  likely  that  the  Commissioner's  consideration  of  this  new

-31-

evidence would have resulted in an award of benefits.  <u>Jones</u>, 122
F.3d at 1154.

        As noted in the above summary of the medical information
of record, the treatment records of Drs. Jotte and Mohrman were in
fact part of the original administrative record and, as discussed
above, were properly considered by the ALJ in reaching his
decision.

        Plaintiff also submitted a letter from Dr. Jotte in which
Dr. Jotte wrote that plaintiff presented to him on June 6, 2011
after a nearly eleven year absence and reported that he had not
been consuming alcohol during the years 1998-2000.  Plaintiff's
statement to Dr. Jotte is belied by the record.  On May 15, 1998,
plaintiff told Dr. Jick that he drank ½ to one pint of alcohol per
day.  On December 21, 1999, Dr. Jotte noted that plaintiff smelled
of alcohol.  On June 8, 2000 plaintiff told Dr. Jotte that he had
reduced his alcohol consumption to four beers per day.  On November
15, 2000, plaintiff told Dr. Jotte that he had cut back to four
beers per day, and had in fact consumed three beers before
presenting for the office visit.  On December 20, 2000, plaintiff
told Dr. Mohrman that he had not been entirely compliant with
medical advice to avoid alcohol.  As the Commissioner correctly
notes, Dr. Jotte's letter provides no basis for remand because it
is unlikely to change the Commissioner's decision.  <u>See</u> <u>Jones</u>, 122
F.3d at 1154 (it must be reasonably likely that the Commissioner's
consideration of the new evidence would have resulted in an award
of benefits).

Plaintiff also submitted a copy of Dr. Mohrman's December 5, 2000 report containing plaintiff's own handwritten annotations challenging various aspects of that report. Next to Dr. Mohrman's notation that plaintiff did not quit drinking as advised in November of 2000, plaintiff writes "Did Quit!" (Docket No. 18 at page 12). Next to Dr. Mohrman's observation that there were times that plaintiff stopped drinking, plaintiff wrote "'98-99 Quit Completely 2000." (Id.) These challenges have no merit in light of the numerous observations, summarized above, from Dr. Mohrman and other treatment providers that plaintiff continued to consume alcohol up to and including December of 2000. Next to Dr. Mohrman's notation that plaintiff stopped taking Furosemide and Spironolactone after only a couple of days, plaintiff wrote "Took All Meds Thru 2000 Quit Only As They Were Doing No Good." Plaintiff's challenge has no merit, as the administrative record documents plaintiff's non-compliance with medication. Also, while plaintiff writes that he stopped taking the medications because they were doing no good, medical records pertaining to plaintiff's condition after the expiration of his insured status document that plaintiff was taking Furosemide and Spironolactone. Plaintiff also writes that the ALJ did not read Dr. Mohrman's report. However, the ALJ specifically noted this report in his decision. See (Tr. 16). For the remainder of his challenges, plaintiff wrote that Dr. Jotte failed to send records upon request and was not informative. Plaintiff also takes issue with Dr. Mohrman's opinion that plaintiff had little insight into his liver disease and that his

-33-

prognosis was grim.  None of these challenges are meritorious or relevant.

The remainder of the evidence plaintiff submitted is new in the sense that it was not in existence during the administrative proceedings, but it is not material because it is not probative of plaintiff's condition before the expiration of his insured status. As summarized above, several medical treatment providers submitted letters dated in 2010 and 2011 stating that plaintiff should be considered for disability.  In support, the providers described the efficacy of the TIPS, and plaintiff's diagnoses of diabetes, hepatic encephalopathy, and brain AVM.  However, none of these letters are probative of plaintiff's condition before the expiration of his insured status.  See Davidson, 501 F.3d at 989 ("Davidson's insured status expired on December 31, 2003, so, like the Commissioner, we consider her condition before that date."). Instead, the letters document a deterioration of plaintiff's condition after the expiration of his insured status, and also document that plaintiff was subsequently diagnosed with diabetes. New evidence can only be considered material if it relates to the claimant's condition for the time period for which benefits were denied, not to "after-acquired conditions or post-decision deterioration of a pre-existing condition." Bergmann, 207 F.3d at 1069-70.

In their letters, the providers also wrote that plaintiff should be considered for disability and that he would be unable to perform work.  Medical provider statements that a claimant is

-34-

disabled or unable to work are not entitled to deference because a "medical source opinion that an applicant is 'disabled' or 'unable to work' ... involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." <u>Ellis</u>, 392 F.3d at 994 (citing <u>Stormo v. Barnhart</u>, 377 F.3d 801, 807 (8th Cir. 2004)).

For all of the foregoing reasons, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole, and should therefore be affirmed.  Because there is substantial evidence to support the decision, reversal is not required merely because substantial evidence may support a different outcome, or because another court could have decided the case differently.  <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.


_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE


Dated this 12th day of October, 2012.

-35-